## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

LAURAN JANE MAGLIOCCO,                                    CIVIL NO. 13-1425 (DWF/TNL)

          PLAINTIFF,

V.                                                                **AMENDED**
                                                        **REPORT AND RECOMMENDATION**

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

          DEFENDANT.

---

Lionel H. Peabody, **Peabody Law Office**, P.O. Box 10, Duluth, MN 55801 for Plaintiff; and

Ann M. Bildtsen, Assistant United States Attorney, 600 United States Courthouse, 300 S. 4th Street, Minneapolis, Minnesota 55415, for Defendant.

## I.    INTRODUCTION

Plaintiff Lauran Jane Magliocco brings the present action, disputing Defendant Commissioner of Social Security's denial of her application for supplemental security income ("SSI"). This matter is before the Court, United States Magistrate Judge Tony N. Leung, on the parties' cross motions for summary judgment. For the reasons set forth herein, this Court will recommend Magliocco's Motion for Summary Judgment (ECF No. 11) be denied, the Commissioner's Motion for Summary Judgment (ECF No. 22) be granted, and this matter be dismissed with prejudice.

II.    FACTS

A. Procedural History

Magliocco filed for SSI on December 28, 2010, alleging disability beginning November 13, 2008. (R. 10, 137.) Magliocco's claim was denied initially (R. 94-97) and on reconsideration. (R. 103-05.) On April 11, 2012, Magliocco had a hearing before ALJ Clarence Daniel Stripling. (R. 29-63.)

In his June 4, 2012 opinion, the ALJ concluded as follows: Magliocco has not engaged in substantial gainful activity since December 28, 2010. (R. 12.) Magliocco suffered from chronic back and neck pain, headaches, posttraumatic stress disorder, anxiety, and depression. (R. 12.) Magliocco did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 12.) Magliocco has the residual capacity to

> perform light work as defined in 20 C.F.R. § 416.967(b) except she can never climb ladders, ropes, or scaffolds; never balance; only occasionally climb stairs or ramps; only occasionally bend, stoop, crouch, kneel, or crawl; must avoid heavy concentrations of dust, fumes or gases, and marked changes in temperature or humidity; is limited to performing simple, routine, repetitive tasks with only occasional, superficial interaction with coworkers or the public.

(R. 13.) Magliocco was unable to perform any past relevant work, but considering her age, work experience, and residual functional capacity, Magliocco could perform all or substantially all of the requirements of hand packer, electronics worker, and small products assembler. (R. 19-20.) The ALJ concluded that Magliocco had not been under a

disability within the meaning of the Social Security Act since December 28, 2010. (R. 20.) Accordingly, the ALJ denied Magliocco's application.

Magliocco requested review of the ALJ's decision, and the Appeals Council denied the request. (R. 1-6.)

### B. Employment Background

Magliocco worked as a cashier for Payless Shoe Stores from 1994 to 2000. (R. 175.) This position required Magliocco to lift and carry 50 to 75 pounds over the course of about two hours when she stocked twice a week. (R. 179.) Magliocco then worked as a shift manager for a convenience store from 2000 to 2003. (R. 175.) In this position, Magliocco did all the duties of cashier, fryer, grill, supervisor, and stock clerk. (R. 180.)  Magliocco has not worked since 2003.

### C. Medical Records[1]

In August of 2002, Magliocco reported problems of mood changes and headaches to her doctor. (R. 311-12.) Magliocco was prescribed Celexa and encouraged to attend individual and family counseling. (R. 312.) She reported that Celexa was effective in treating her mood changes. (R. 313.)

Magliocco began psychotherapy with Lori Sterna, LP, in February 2005 to address stressors, stabilize her moods, and develop stress management skills. (R. 566-69.) Sterna's initial diagnosis was generalized anxiety disorder with depressive traits.

---

[1] Magliocco does not challenge the ALJ's determination regarding her physical residual functional capacity or the ALJ's conclusion that she is not physically disabled. Accordingly, the Court will include only the medical history relevant to the ALJ's mental residual functional capacity determination and weight determinations.

(R. 569.) On July 29, 2005, Magliocco was going through a divorce, facing possible bankruptcy, and addressing allegations that her daughters had possibly been sexually abused by their father. (R. 561.)

On September 12, 2009, Magliocco's 4-year-old son was hit by a car and hospitalized with a serious head injury. The next day, Magliocco presented at the emergency room the next day with chest tightness and shortness of breath. (R. 390-91.) Magliocco's son died of injuries related to the incident shortly thereafter.

On December 16, 2010, Magliocco presented complaining of back pain and depression. (R. 461-63.) She presented with a normal affect and oriented to time, place, person, and situation. (R. 463.) An MRI showed interval development of C5-6 degenerative changes without nerve compression compared to a 2005 MRI, and no significant changes in T6-7 and T9-10. (R. 463.) Magliocco was prescribed heat, ice, and exercise for her pain. (R. 463.) Her Citalopram prescription was decreased and her lorazepam prescription was continued with orders to follow up in six months. (R. 463.)

On January 21, 2011, Marlin Trulsen, Ph.D., LP, examined Magliocco for the Minnesota Disability Determination Services. (R. 486-91.) Trulsen noted that Magliocco's "general mental capacity for understanding, remembering, and following instructions all appear adequately developed and show no general impairment." (R. 490.) He further opined that, based on Magliocco's reported mental health symptoms, her "general mental capacity for sustaining attention and concentrating would appear to demonstrate a slight level of impairment." (R. 490.)

Magliocco visited Anderson on February 3, 2011. (R. 548.) She was crying and grieving the loss of her son and continued to spend much time alone in her room. (R. 548.) She was making efforts to be with her grandson and be on the computer. (R. 548.) On February 9, 2011, Magliocco was very smiley and animated during her appointment with Anderson. (R. 547.) Magliocco reported that she was getting out of her room more often and discussed her troubled relationship with her daughter. (R. 547.) On March 2, 2011, Magliocco reported to Anderson that she had told her daughter and her daughter's boyfriend to move out. (R. 546.) She remained troubled by her relationship with her daughters. (R. 546.)

Magliocco began seeing Jane M. Anderson, MS LP, for outpatient psychotherapy frequently in early 2011. (R. 539-49.) Magliocco presented with a depressed affect, general anxiety, and impaired concentration, complaining of depression, pain, and isolation. (R. 541.) Anderson diagnosed Magliocco with Major Depressive Disorder (Recurrent, Moderate) and Posttraumatic Stress Disorder. (R. 541.) On March 14, 2011, Anderson noted that Magliocco was processing her grief. (R. 545.) Magliocco had greatly reduced the amount of time she stayed in her room from 80% to 5% of the time. (R. 545.) Magliocco and Anderson discussed her relationships with her daughters and how Magliocco could better relate to them. (R. 545.)

On March 28, 2011, Magliocco discussed her relationships with her daughters and how she was hurt that none of them called on the anniversary of her son's death to see how she was. (R. 544.) She displayed "much black and white thinking" and did not appear "open to changing her thinking." (R. 544.) On April 25, 2011, Magliocco was

crying when she arrived at Anderson's office. (R. 543.) She said that a little boy was in the waiting room and it was still difficult for her to be around little boys. (R. 543.) Magliocco stated that she did not think this kind of outburst would happen again. (R. 543.)

On April 22, 2011, Magliocco presented with pain in her right anterior chest after falling and hitting her right rib area on a chair. (R. 589-91.) She appeared alert, healthy, and cooperative. (R. 591.) She was determined to have a sprained rib and prescribed rest, ice, and ibuprofen. (R. 591.) No mention was made of any psychological symptoms. (R. 591.)

Magliocco saw Dr. Lynn Maclean on June 2, 2011, following up on a colonoscopy and complaining of chronic back and neck pain. (R. 585.) Magliocco was alert and oriented, and her mental status was normal. (R. 588.) Dr. MacLean specifically noted no significant anxiety, depression, or panic. (R. 587.)

Magliocco saw Gerald Ouellette, LP, on a regular basis over the second half of 2011. (R. 631-45.) The first appointment was August 31, 2011. (R. 631.) On a scale of 1-10 (non-depressed to severely distressed), Magliocco presented at a 6-7. (R. 631.) She was having a very hard time in the lead up to the anniversary of her son's death. (R. 631.) Despite this difficulty and suffering daily crying bouts and sadness, Magliocco was able to keep appointments and do daily activities. (R. 631.)

Magliocco saw Ouellette again on September 12, 2011. (R. 632.) At this appointment, she presented as an 8 on a scale of 1-10 (non-depressed to severely distressed). (R. 632.) She had recently spent an entire day crying. (R. 632.) Ouellette

noted that she was under "lots of stress" considering the upcoming anniversary of her son's death, a pending court date in the wrongful death suit concerning her son, and moving. (R. 632.) Magliocco's next appointment with Ouellette was September 28, 2011. (R. 633.) At this appointment, she presented as a 1 on a scale of 1-10 (non-depressed to severely distressed). (R. 633.) She reported making it through the court date and spoke about her parents. (R. 633.)

Ouellette created a Rehabilitation Re-Evaluation/Plan of Care for Magliocco on October 5, 2011. (R. 634-35.) Ouelete noted that Magliocco was "managing to deal with ongoing stressors related to the death of her son" and, with her antianxiety medication, was "able to keep her wits about her and function" in stressful interactions, "although with significant distress." (R. 634.) Ouellette noted that Magliocco's developmental years had been "difficult and challenging," and that she expressed "appropriate grief and distress over many events during that time period" and "show[ed] insight as to how that experience affects her to some degree still in the present." (R. 635.) In Ouellette's judgment, Magliocco was "aware of her stress and grief experience" and "struggling to deal with the progress on the continuum." (R. 635.)

Magliocco next saw Ouellette on October 11, 2011. (R. 636.) At this appointment, she presented as a 6-7 on a scale of 1-10 (non-depressed to severely distressed). (R. 636.) She also complained of headaches and back aches, high stress, and negative thoughts. (R. 636.) At her next appointment on October 25, Magliocco presented as a 4 on a scale

of 0-10[2] (non-depressed to severely distressed). (R. 637.) Her boyfriend's father had recently died, and Magliocco recognized that his funeral triggered memories of the loss of her son. (R. 637.)

Magliocco again saw Dr. MacLean on October 31, 2011, for a general physical examination. (R. 624-29.)  At this appointment, Magliocco reported that she was "doing fairly well at this time" with respect to her depression. (R. 624.) Upon examination, Magliocco appeared healthy, alert, and oriented. (R. 628.) Her mental status was normal, she presented no psychiatric issues, and her depression was overall controlled. (R. 628.)

On November 8, 2011, Magliocco presented as a 5 on a scale of 0-10 (non-depressed to severely distressed). (R. 638.) She was experiencing high stress, but she showed insights and knew "a lot of what she should do, but still need[ed] to process" her losses and issues. (R. 638.) On November 29, 2011, she presented as a 0 on a scale of 0-10 (non-depressed to severely distressed). She complained of a bad headache, rating the pain at 7 out of 10. (R. 639.) Her mood was better, and she showed signs of being able to address stress reactions. (R. 639.)

Ouellette provided another Rehabilitation Re-Evaluation/Plan of Care on November 30, 2011. (R. 640-42.) According to Ouellette's evaluation, Magliocco had the insight to know that she was distracted by several demands on her time and energy. (R. 641.) Her crying bouts were not as debilitating as they once were, and she was able to resume her tasks after taking a short time to compose herself. (R. 641.) Magliocco was

---

[2] The Mood Scale that Ouellette used changed from "1-10" to "0-10" beginning with the October 25, 2011 appointment.

also showing progress in being able to explore her automatic thoughts related to anger and avoidance. (R. 641.)

On January 4, 2012, Magliocco had another appointment with Ouellette. (R. 643.) At this appointment, she presented as a 4 on a scale of 0-10 (non-depressed to severely distressed). (R. 643.) Ouellette noted that Magliocco "continue[d] to grieve heavily – despite a brighter mood some of the time and much less open crying [and] apparent grieving." (R. 643.) Magliocco had been able to have an open and productive talk with her daughters, the youngest of which was moving back in with her. (R. 643.) Her daughter told her that she though Magliocco had changed and "was getting better than she was after [her son] had died" when she became "isolated [and] didn't interact with her daughters." (R. 643.) On January 25, 2012, Magliocco presented to Ouellette as a 3 on a scale of 0-10 (non-depressed to severely distressed). (R. 645.) Magliocco believed that she was getting better, and had been having less intense episodes less frequently. (R. 645.)

Ouellette evaluated Magliocco's mental functional limitations on February 8, 2012. (R. 648-52.) He indicated that Magliocco had moderate limitations in daily living activities, marked limitations in social functioning and concentration, persistence and pace, and four or more episodes of decompensation. (R. 648.) Ouellette opined that Plaintiff would frequently be unable to maintain regular attendance, be punctual, and perform work at a consistent pace. (R. 650.) He further opined that Magliocco would occasionally be unable to perform activities on a schedule or without special supervision. (R. 650.) Ouellette opined that Magliocco had a "residual disease process (mental

impairment) that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate." (R. 652.) Ouellette also noted that Magliocco had a "current history of 1 or more years' inability to function outside of a highly supportive living arrangement with an indication of continued need for such an arrangement." (R. 652.)

### D. Residual Functional Capacity Assessments

#### 1. Physical RFC Assessment

Dr. James Stevenson conducted a physical residual functional capacity (RFC) assessment on February 7, 2011.  (R. 497-504.) Dr. Stevenson opined that Magliocco could occasionally life 50 pounds, frequently lift 25 pounds, and stand and/or walk with normal break for about 6 hours in an 8 hour work day. (R. 498.) Dr. Stevenson also opined that Magliocco's ability to push and/or pull was not limited beyond the limitations on lifting and carrying. (R. 498.) Dr. Stevenson further opined that Magliocco could frequently climb ramps and stairs, never climb ladders/ropes/scaffolds, frequently balance, and occasionally stoop, occasionally kneel, occasionally crouch, and occasionally crawl. (R. 499.) Dr. Stevenson opined that Magliocco required no manipulative, visual, or communicative limitations, and that the only required environmental limitations were to avoid even moderate exposure to vibration and hazards (machinery, heights, etc.). (R. 500-01.)

#### 2. Mental RFC Assessment

Psychologist A.S. Johnson assessed Magliocco's mental residual functional capacity on February 11, 2011. (R. 505-18.) Johnson opined that Magliocco's

impairments were not severe and determined that she suffered from affective disorders and anxiety-related disorders. (R. 505, 508, 510.) Johnson noted that Magliocco reported being moderately to occasionally markedly impaired with respect to: (1) carrying out tasks with reasonable pace and persistence; (2) handling brief and superficial contact, and (3) tolerating workplace stress. (R. 517.) Independently, however, Johnson gave only partial weight to Magliocco's self-reported limitations because her limitations appeared to be more physical than psychological. (R. 517.) Johnson ultimately opined that Magliocco was mildly limited with respect to activities of daily living; maintaining social functioning; and maintaining concentration, persistence and pace. (R. 515.) Johnson also opined that Magliocco was able to follow instructions and that her attention is dependent on her headaches. (R. 517.) Johnson opined that Magliocco was not limited with respect to episodes of decompensation. (R. 515.) Johnson noted that Magliocco could cooperate and tolerate the casual interactions necessary to perform tasks. (R. 517.) Ultimately, Johnson concluded that Magliocco's impairment is not severe. (R. 517.)

### E.  Administrative Hearing

A hearing before an Administrative Law Judge ("ALJ") occurred on April 11, 2012. (R. 29-63.) Magliocco testified about her conditions as follows: The biggest problem that she has that keeps her from working is her depression. (R. 42.) She also gets a lot of headaches. (R. 42-43.) Her headaches are worse when she does something a little more physical and are sometimes bad enough to require her to lie down in her room with a heating pad. (R. 42-43.) Her headaches are bad enough to require a heating pad three or four times a month. (R. 48.) She never has a day without pain. (R. 43.) When she's

depressed, her headaches are worse. (R. 48.) Two or three times a month, she will cry for a half hour to an hour as a result of stress. (R. 52-53.)

She spends her days watching TV and talking to her daughter. (R. 43.) She takes care of the apartment "on a limited basis." (R. 44.) She can do a load of laundry when necessary, but not every day. (R. 44.) She can "pretty much cook anything" as long as she is "not standing over the stove slaving." (R. 44.) She goes shopping with her boyfriend. (R. 45.) She can drive, but she doesn't drive long distances because that's hard on her. (R. 45.) She does not really stay busy with friends, but they do call her. (R. 45.) She maintains a Facebook page and watches some television. (R. 44-45.) On days when she is down, she sits in her room alone in the dark. (R. 50.) She gets out into the community about twice a month with her boyfriend to go shopping or for appointments. (R. 50-51.) She goes to appointments alone about once a month. (R. 51.)

Magliocco further testified that she has "no desire to be out and public and be with people" when "there's a lot of children around" because she "get[s] anxieties." (R. 51.) When that happens, she gets nauseous, her chest hurts, and she can't breathe very well. (R. 52.) Out of 10 times that Magliocco goes out into public, she has these symptoms three-to-five times. (R. 52.) She also suffers crying bouts two or three times a month. (R. 53.) These crying bouts have increased since her son died. (R. 54.)

Mary Harris testified as a vocational expert. (R. 55-61.) The ALJ presented Harris with several hypothetical individuals, each with limitations similar to those testified to by Magliocco. The first hypothetical assumed an individual who can work at a "light exertional level" who cannot climb ladders, ropes, or scaffolds; cannot balance; can only

occasionally climb stairs or ramps; can only occasionally bend, stoop, crouch, kneel, or crawl; must avoid heavy concentration of dust, fumes, or gasses; and cannot endure marked changes in temperature and humidity. (R. 56-57.) Harris testified that such an individual could work as a cashier, a hand packager, an electronic worker, or an office helper. (R. 57.) Harris also testified that a significant number of these jobs exist in the national economy and the state of Minnesota. (R. 57.)

The ALJ's second hypothetical assumed an individual with the same limitations, but limited the individual to simple routine, repetitive tasks, with only occasional, superficial interaction with co-workers and the public. (R. 57.) Harris opined that such an individual could not perform the work of a cashier or office helper, but that hand packager and electronic worker would still be available. (R. 57.) Harris also opined that the individual could perform the job of small products assembler, and that a significant number of these jobs exist in the national economy and the state of Minnesota (R. 58.)

The ALJ's third hypothetical assumed the same limitations as the second hypothetical, with the further limitation that the individual could perform only sedentary work. (R. 58.) Harris testified that there are sedentary jobs within the categories of hand packager and small products assembler. (R. 58.) Harris testified that a smaller, but still significant number of these jobs exist in the national economy and the state of Minnesota. (R. 58.)

The ALJ's fourth hypothetical assumed an individual with "such underlying physical and mental conditions that they're going to miss at least three days a month of

work." (R. 59.) Harris testified that an individual with those limitations could not perform any jobs in the national economy. (R. 59.)

When cross-examined by Magliocco's attorney, Harris testified that an individual unable to perform fine tasks with her hands could still work as a small product assembler. (R. 59.) Harris also testified that if Magliocco needed to change positions at will pursuant to a doctor's orders, this would not prevent her from being employed so long as she did not have to leave the workstation. (R. 59-60.) Harris also testified that employers would not employ Magliocco if she were unable to (1) maintain attendance up to two-thirds of the time, (2) complete a workday without interruptions from psychologically-based symptoms, (3) maintain attention and concentration for extended periods of time, (4) perform activities within a schedule, or (5) sustain an ordinary routine without special supervision. (R. 60.)

### F. ALJ's Decision

On June 4, 2012, the ALJ issued a decision denying Magliocco's claim. (R. 7-20.) In his decision, the ALJ found as follows: Magliocco had not engaged in substantial gainful activity since December 28, 2010. (R. 12.) Magliocco has the following severe impairments: chronic back and neck pain, headaches, posttraumatic stress disorder, anxiety, and depression. (R. 12.)

The ALJ determined that Magliocco does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 12.) With respect to Magliocco's physical symptoms, the ALJ noted that "the evidence establishes neither

14

(1) an inability to ambulate effectively on a sustained basis, nor (2) an inability to perform fine and gross movements." (R. 12-13.) The ALJ also considered Magliocco's mental impairments and found that "the record does not establish marked difficulties or repeated episodes of decompensation." (R. 12.)

The ALJ  determined that Magliocco has the residual functional capacity to perform light work as defined in 20 C.F.R. § 416.967(b), except that she can never climb ladders, ropes or scaffolds; never balance; only occasionally climb stairs or ramps; only occasionally bend, stoop, crouch, kneel, or crawl; must avoid heavy concentration of dust, fumes, or gases, and marked changes in temperature or humidity; and is limited to performing simple, routine, repetitive tasks with only occasional, superficial interaction with coworkers or the public. (R. 13.)

The ALJ found that Magliocco's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible" to the extent they were inconsistent with the ALJ's functional capacity assessment. (R. 14.) Initially, the ALJ found that Magliocco's asthma requires her to avoid heavy concentration of dust, fumes or gases and marked changes in temperature or humidity. (R. 15.) The ALJ also found that that the longitudinal record fails to support Magliocco's physical limitations. (R. 15.) Specifically, the ALJ found that the discrepancies between Magliocco's "allegations and the objective medical record, supported by the treatment records of her physicians and the diagnostic evidence, cannot be resolved in [her] favor based on this record." (R. 15.) The ALJ noted that Magliocco

15

"undertook a course of physical therapy with excellent results," "reported that her pain was well managed with chiropractic manipulation and a prescription for Ibuprofen and Hydrocodone," and "[i]n October 2011, [she] reported that her back and neck pain remained under good control." (R. 15.) After evaluating Magliocco's pain within the guidelines set forth in Social Security Ruling 96-7p, the ALJ found that the record contained "no substantial evidence that [Magliocco's] pain significantly interferes with her ability to maintain concentration and attention." (R. 15.)

The ALJ afforded no significant probative value to Dr. Maclean's opinion "because there is no support for such limitations in the medical record." (R. 15-16.) Despite Dr. Maclean's opinions that Magliocco is significantly more limited than set forth in the ALJ's RFC assessment, the ALJ noted that Magliocco's "subjective allegations" and "other substantial evidence of record indicates that [she] reported her pain was well controlled with medication within 12 months of her application." (R. 16.)

With respect to Magliocco's mental limitations, the ALJ noted that the record confirms that Magliocco has reported feelings of depression and anxiety since the death of her 4-year-old son, as well as significant posttraumatic stress. (R. 16.) The ALJ noted that Magliocco obtained psychopharmacological medication and that "treatment records document [her] processing of her grief and family stress." (R. 16.)

Marlin Trulsen, Ph.D, an impartial medical consultant, concluded that Magliocco's general mental capacity for understanding, remembering, and following instructions was adequately developed and showed no impairment. (R. 17.) Dr. Trulson also opined that Magliocco "demonstrated a slight level of impairment per her self-

reports of current mental health symptoms," but "that this would not prevent her from being effective in" sustaining attention and concentrating." (R. 17.) Dr. Trulsen further opined that Magliocco's mental capacity for carrying out work-like tasks with reasonable persistence or pace, respond appropriately to brief and superficial contact with coworkers and supervisors, and to tolerate stress and pressures typically found in an entry-level workplace would cause a moderate-to-occasionally-marked level of impairment. (R. 17.) "[T]hese deficits would diminish with continued psychopharmacological review and therapeutic services designed to increase coping and problem-solving strategies." (R. 17.)

Because evidence of functional limitations attributable to mental impairment existed, the ALJ evaluated the "B" criteria. (R. 17.) The first "B" criterion is "activities of daily living," including "adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, using the post office, etc." (R. 17.) The ALJ found that Magliocco's "activity level is rather broad despite her affective disorder and does not impose more than a mild limitation on her activities of daily living." (R. 17.) For support, the ALJ noted that the record indicates Magliocco can drive herself and use public transportation, and she testified that she washes dishes, sweeps, dusts, does laundry, makes meals, shops for groceries, goes for walks, uses a computer and enjoys watching television. (R. 17.)

The second "B" criterion, "social functioning," refers to a claimant's capacity to interact and communicate with others. The ALJ found that Magliocco "is able to respond appropriately, carry on a conversation, and does not demonstrate any disruptive

behavior." (R. 17.) The ALJ noted that, even though she has a tendency to prefer to be out of the public directly, Magliocco does not exhibit anti-social activities and testified that she is socially active with friends and a boyfriend. (R. 17.) The ALJ found that "[t]he evidence as a whole establishes [a] moderate degree of limitation in [Magliocco's] social functioning such that she should have only occasional interactions with coworkers or the general public." (R. 17.)

The third "B" criterion, "concentration, persistence, and pace," refers to a claimant's ability to sustain focused attention in a work setting. The ALJ determined that Magliocco does have evidence of a "reduced ability in this area of functioning due to the combined effect of her mental and physical impairments." (R. 18.) Based on the entirety of the record, the ALJ found that Magliocco "has a moderate limitation in her ability to sustain focused attention such that she is limited to understanding, remembering, and carrying out simple, routine, repetitive tasks." (R. 18.)

With respect to the fourth "B" criterion, the ALJ found no evidence in the record that Magliocco has a history of deterioration or decompensation in work or work-like settings. (R. 18.)

The ALJ determined that the opinion of licensed psychologist Gerry Ouellette, MS LP, did not deserve significant evidentiary weight because he found "no evidence that his observations are based on special knowledge that he has gained as a treating, primary care provider." (R. 18.) The ALJ noted that Ouellette is a non-physician and therefore he is not an "acceptable medical source" within the meaning of the regulations, but his opinion as "an other testing source" is entitled to careful consideration. (R. 18.) The ALJ

considered the following factors in determining how much weight to give Ouellette's opinion: how long Oulette has known and how frequently Ouellette has seen Magliocco; how consistent the opinion is with the other evidence; the degree to which Ouellette presents relevant evidence to support his opinion; how well Ouellette explains the opinion; whether Ouellette has a specialty or area of expertise related to Magliocco's impairment; and any other factors that tend to support or refute the opinion. (R. 18.) The ALJ noted that Ouellette reported Magliocco had suffered four or more episodes of decompensation, but Magliocco's treatment notes did not document any psychiatric submissions. (R. 18.) Ouellette also opined that Magliocco has marked restrictions in social functioning and concentration, but the ALJ found that this opinion is not supported by the treatment record. (R. 18.) The ALJ found that Magliocco is unable to perform any past relevant work as set forth in 20 C.F.R. § 416.925. The ALJ determined that the work in Magliocco's past requires the performance of complex tasks, which is beyond Magliocco's current abilities. (R. 19.)

The ALJ considered Magliocco's age, education, work experience, and RFC and determined that jobs exist in significant numbers in the national economy that Magliocco can perform. (R. 19.) The ALJ noted that Magliocco's "ability to perform all or substantiall all of the requirements of [light] work has been impeded by additional limitations." (R. 19.) Based on Harris's testimony as vocational expert, the ALJ concluded that, "considering [Magliocco's] age, education, work experience, and [RFC], [Magliocco] is capable of making a successful adjustment to other work that exists in

significant numbers in the national economy." (R. 20.) The ALJ found that Magliocco was not disabled and denied her claim.

## III.   ANALYSIS

### A. Standard of Review

Review by this Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Murphy v. Sullivan*, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "Substantial evidence on the record as a whole, . . . requires a more scrutinizing analysis." *Id.* (quotation omitted).

The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (stating that the ALJ's determination must be affirmed even if substantial evidence would support the opposite finding). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf*, 3 F.3d at 1213. Rather, the Court "must consider both evidence that supports and evidence that detracts from the [ALJ's] decision" and "may not reverse merely because substantial evidence exists for the opposite decision." *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996). If it is

possible to reach two inconsistent positions from the evidence, then the court must affirm the ALJ's decision. *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992).

To be entitled to SSI a claimant must be disabled. 42 U.S.C. § 1382(a)(1). A "disability" is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905. The Social Security Administration adopted a five-step procedure for determining whether a claimant is "disabled" within the meaning of the Social Security Act. 20 C.F.R. § 416.920(a)(4). The five steps are: (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to his or her past relevant work; and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. § 416.920(a)(4)(i)-(v). The claimant has the burden of proof to show he or she is disabled through step four; at step five, the burden shifts to the Commissioner. *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir. 2004); *see also* 20 C.F.R. § 416.912(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

## B.  Substantial Evidence Supports the ALJ's Decision

Plaintiff disputes the ALJ's determination, arguing (1) the ALJ failed to assess Ouellette's opinion in the manner required by law and failed to give good reasons for its weight determinations for treating-source opinions; and (2) the ALJ's decision is not supported by substantial evidence in the record as a whole.

### 1.  Substantial Evidence Supports the ALJ's Determination that Ouellette's Opinion Is Not Entitled to Great Weight

Magliocco argues, and the Commissioner concedes, that the ALJ erred in weighing Ouellette's opinion because licensed psychologists are acceptable medical sources, and that Ouellette had an ongoing treatment relationship with Magliocco that could possibly be given controlling weight. (Comm'r's Mem. at 7, ECF No. 23.) The Commissioner argues, however, that even though the ALJ improperly characterized Ouellette's opinion, he gave Oullette's opinion proper consideration.

Federal regulations define "medical opinions" as

> statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, and what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 416.927(a)(2). Regulations consider a licensed or certified psychologist to be an "acceptable medical source." *Id.* § 416.916 (a)(1)-(2). Magliocco argues that the ALJ failed to assess Ouellette's opinion in the manner required by law.

Federal regulations require the following factors to be considered when deciding the weight to be given a medical opinion: length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; whether any relevant medical evidence supports the opinion; the opinion's consistency with the record as a whole; whether the opinion is from a specialist in the area of his specialty; and any other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(1)-(6). An ALJ may reject a treating source's opinion if it is inconsistent

with the record as a whole. *McCoy v. Astrue*, 648 F.3d 605, 616 (8th Cir. 2011). "Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give good reasons for that weighing." *Holmstrom v. Massanari*, 279 F.3d 715, 720 (8th Cir. 2001); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence.") (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

Although the ALJ incorrectly labeled Ouellette as not an acceptable medical source, he quickly noted that Ouellette's opinion is entitled to careful consideration. Indeed, the ALJ explicitly considered how long Ouellette had known and how frequently Ouellette had seen Magliocco, how consistent Ouellette's opinion is with the other medical evidence, the degree to which Ouellette presented relevant evidence to support his opinion, how well Ouellette explained his opinion, whether Ouellette had a specialty or area of expertise related to Magliocco's impairment, and any other factors that supported or refuted Ouellette's opinion. *See* (R. 18); *see also* 20 C.F.R. § 416.927(c)(2)(i)-(6).

Moreover, it was not error for the ALJ not to accept Ouellette's opinion as controlling. "The ALJ is required to give weight to a treating physician's opinions about a claimant's ability to work. The ALJ is not required, however, to simply accept those opinions. Indeed adoption of a treating physician's opinions without consideration of

other evidence would constitute error." *Keeley v. Astrue*, No. 08-cv-276 (PAM/AJB), 2009 WL 803475, *1 (D. Minn. Mar. 25, 2009). An ALJ can draw his own conclusions from the evidence in the record when assessing a claimant's residual functional capacity and determining the claimant's limitations.

Here, the ALJ determined that Ouellette's opinion did not provide "any significant insight" into Magliocco's ability to function because it was at odds with Magliocco's treatment record. The ALJ specifically noted that Ouellette opined that Magliocco had undergone "four or more" episodes of decompensation, even though Magliocco's medical record does not show any psychiatric admission. The ALJ determined that Magliocco's "primary care examinations consistently document that she present[ed] for treatment with no noted psychiatric symptoms and [was] alert and fully oriented." (R. 16.) This determination is supported by substantial evidence on the record. *See*, *e.g.*, (R. 448) (July 30, 2009 – presented as alert and oriented without unusual anxiety or evidence of depression); (R. 452) (September 14, 2009 –presented with a normal affect and oriented to time, place, person, and situation); (R. 453-54) (September 28, 2009 - presented as oriented to time, place, person, and situation; showed a normal affect, not anxious; appeared to be coping well); (R. 455-56) (October 29, 2009 – oriented to time, place, person; appeared to be coping ok); (R. 458) (November 23, 2009 – presented as alert and oriented; not unusually anxious and no evidence of depression); (R. 463) (oriented to time, place, person, and situation; presented with a normal affect and no anxiety); (R. 468) (March 22, 2010 – presented alert and oriented with no unusual anxiety or evidence of depression); (R. 473) (September 3, 2010 – presented oriented to time,

place, person, and situation; normal insight and not anxious); (R. 587-88) (June 2, 2011 – presented with no significant anxiety, depression or panic; normal mental status without psychiatric issues, alert and oriented in time, place, and person); (R. 624) (October 31, 2011 – feeling well overall, self-reported to be doing fairly well with depression).

Moreover, the limitations that Ouellette recommended were not mentioned in Magliocco's treatment records from her appointments with Ouellette. Ouellette opined that Magliocco had moderate limitations in daily living activities, marked limitations in social functioning and concentration, persistence and pace, and four or more episodes of decompensation. (R. 648.) Ouellette's notes, however, do not reflect how Magliocco's impairments affect her concentration, persistence, or pace. The ALJ determined that substantial evidence on the record—including Magliocco's ability to watch and follow television shows and movies and to use a computer for emailing and maintaining her Facebook page—supported his conclusion that Magliocco's impairments were moderate rather than marked. (R. 18.) Magliocco argues that the ALJ is "playing doctor" by arriving at a conclusion that is different from a treating source. An ALJ is "not required, however, to simply accept [a treating source's] opinions. Indeed adoption of a treating physician's opinions without consideration of other evidence would constitute error." *Keeley*, 2009 WL 803475, at *1. The Court determines that the ALJ's conclusion that Magliocco has moderate limitations affecting her concentration, persistence and pace is supported by substantial evidence on the record.

With respect to Magliocco's ability to maintain regular attendance within customary tolerances, Ouellette opined that Magliocco would frequently be unable to

maintain regular attendance, be punctual, and perform work at a consistent pace; that Magliocco would occasionally be unable to perform activities on a schedule or without special supervision; and that Magliocco had a "residual disease process (mental impairment) that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause [her] to decompensate." (R. 650, 652.) Ouellette's notes, however, do not mention Magliocco canceling or forgetting an appointment. Indeed, at the beginning of their treatment relationship, Ouellette noted that Magliocco "remain[ed] able to keep appointments [and] do daily activities." (R. 631.) Medical records show that of 16 scheduled therapy appointments scheduled between April 12 and June 13, 2011, Magliocco canceled only one and never no-showed. (R. 598.) Accordingly, the Court concludes that the ALJ's determination that Magliocco is able to maintain regular attendance within customary tolerances is supported by substantial evidence on the record.

Magliocco also argues that the objective medical record supports Ouellette's statement that she has suffered four or more episodes of decompensation. The ALJ disagreed with Ouellette, stating that Magliocco's medical records did not document any hospital admissions for psychiatric reasons. Magliocco argues, once again quite correctly, that hospitalization is only one way to prove decompensation. The regulations provide that "[t]he term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Part 404, Subpart P, Listing 12.00C4. The regulations continue:

> If you have experienced more frequent episodes of shorter duration
> of less frequent episodes of longer duration, [the Commissioner]
> must use judgment to determine if the duration and functional effects
> of the episodes are of equal severity and may be used to substitute
> for the listed finding in a determination of equivalence.

*Id.*  Here, Magliocco's medical records do not contain any episodes of decompensation that last for at least two weeks. Her records repeatedly reference crying spells that last a very short time, occasionally only fifteen minutes. In this circumstance, the ALJ must use his judgment to determine whether the duration and functional effects of Magliocco's episodes are equivalent to an episode of decompensation.

The ALJ found that "[t]he record has not established that [Magliocco] has a work history which has been severely affected by her mental impairments" and, therefore, found "no evidence of . . . decompensation in work-like settings." (R. 18.) Because he could not look to such a work history, the ALJ could use only the objective medical record and Magliocco's statements concerning her impairment to determine whether the effects of Magliocco's episodes were equivalent to an episode of decompensation. The ALJ noted that Magliocco's statements concerning her impairment and its impact on her ability to perform work were considerably more restrictive than the medical record would support. (R. 18.) The ALJ determined that Magliocco's "limitations are self imposed restrictions not supported by the medical evidence. The allegations of disabling depression and anxiety are not supported in the medical evidence by clinical signs, symptoms, or laboratory findings (20 C.F.R. § 426.928)." (R. 18.) The objective evidence in the medical record supports this determination. When Magliocco became overwhelmed at a family party, she was able to compose herself in private and rejoin the

party after taking her medication. (R. 639.) Magliocco was also able to cope with inherently stressful situations, including her late son's birth father seeking part of a monetary settlement (R. 633) and having to remodel her home because of a mold problem (R. 640-41). In light of the foregoing, the Court determines that substantial evidence on the record supports the ALJ's weight determination.

## 2. Substantial Evidence Supports the ALJ's Decision

As set forth above, the ALJ's decision regarding how much weight to give the Ouellette's opinion was supported by substantial evidence on the record as a whole, and the ALJ's decision contained a thorough analysis of Magliocco's credibility. Magliocco specifically argues that it was error for the ALJ to state, "No treating or examining medical source has imposed restrictions consistent with the claimant's allegations." (R. 18.) Magliocco is correct in that Ouellette, a treating medical source, imposed restrictions consistent with Magliocco's allegations. As set forth above, however, the ALJ carefully considered Ouellette's opinion and gave it little weight because it was not supported by the objective medical evidence.

The ALJ considered the record as a whole and found that Magliocco was capable of performing light work as defined by 20 C.F.R. § 416.927(a) with certain restrictions. The ALJ noted that Magliocco's examinations consistently document that she presented for treatment with no noted psychiatric symptoms. (R. ); *see also* (R. 631-45.) Magliocco's medical records document that her depression was generally controlled with medication. (R. 624-28.) Magliocco often presented to her treating psychologist alert and oriented with no noted psychiatric symptoms. (R. 631-45.) She is able to drive and use

28

public transportation on her own. (R. 45.) She cooks (R. 44, 49), sweeps (R. 48-49), does laundry (R. 44), shops for groceries (R. 45), uses a computer (R. 45), and occasionally goes for walks (R. 44). Magliocco is able to carry on a conversation, does not exhibit anti-social behaviors, and testified that she gets out a few times a month with her boyfriend (R. 50-51). The record does demonstrate that Magliocco has a moderate limitation in her ability to sustain focused attention, and the ALJ accommodated that limitation in his RFC by determining that she should be required to understand, remember, and carry out only simple, routine, repetitive tasks. Trulsen, a consulting psychologist, opined that Magliocco's general mental capacity for sustaining attention and concentrating demonstrated only a slight level of impairment. In light of the foregoing, the Court determines that the record contains sufficient evidence to support the ALJ's determination.

Whether or not other evidence in the record *could* support a different finding, *see Woolf*, 3 F.3d at 1213, the ALJ's determination is supported by substantial evidence in the record.

## IV.    CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 22) be **GRANTED**, and this action be **DISMISSED WITH PREJUDICE**.


Date:  August 5, 2014                                s/ Tony N. Leung
                                                     Tony N. Leung
                                                     United States Magistrate Judge
                                                     District of Minnesota

                                                     *Magliocco v. Colvin*
                                                     File No. 13-cv-1425 (DWF/TNL)


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **August 19, 2014.**